STATE OF CONNECTICUT *v.* VASKA ANDERSON
(SC 16225)

McDonald, C. J., and Borden, Norcott, Sullivan and Vertefeuille, Js.*

---

* Although Chief Justice McDonald reached the mandatory age of retirement before the date that this opinion was officially released, his continued

Argued October 26, 2000—officially released March 13, 2001

participation on this panel is authorized by General Statutes § 51-198 (c). The listing of justices reflects their seniority status on this court as of the date of oral argument.

*Nancy L. Chupak*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Victor Carlucci, Jr.*, assistant state's attorney, for the appellant (state).

*Wesley S. Spears*, for the appellee (defendant).

*Opinion*

BORDEN, J. The state appeals, following our grant of certification, from the judgment of the Appellate Court reversing the defendant's conviction on drug possession and distribution charges. The state claims that the Appellate Court improperly concluded that: (1) certain juror misconduct occurring during the course of the trial required the exercise of the Appellate Court's supervisory authority so as to require a new trial; and (2) the jury misconduct in this case constituted a structural defect that required a new trial. We reverse the judgment of the Appellate Court.

The defendant, Vaska Anderson, was charged with possession of more than one kilogram of marijuana with intent to sell by a person who is not drug-dependent in

violation of General Statutes § 21a-278 (b), conspiracy to distribute more than one kilogram of marijuana by a person who is not drug-dependent in violation of General Statutes §§ 53a-48 (a) and 21a-278 (b), possession of more than one kilogram of marijuana with intent to sell within 1500 feet of a school in violation of General Statutes § 21a-278a (b), assault on a peace officer in violation of General Statutes § 53a-167c (a) (1), and failure to appear in the first degree in violation of General Statutes § 53a-172 (a). During the state's case, the defendant moved for a mistrial, based upon improper statements allegedly made by one of the jurors to the other jurors. The trial court denied the motion. The jury found the defendant guilty of all charges, except assault on a peace officer and failure to appear, and the trial court rendered a judgment of conviction. The defendant appealed to the Appellate Court contending, inter alia, that the trial court improperly had denied his motion for a mistrial based on juror misconduct.[1] The Appellate Court reversed the defendant's conviction and ordered a new trial. *State* v. *Anderson*, 55 Conn. App. 60, 738 A.2d 1116 (1999). This certified appeal followed.[2]

The underlying facts, as set forth by the Appellate Court, are as follows: "On August 14, 1993, a Connecticut state police detective received notice from the Drug

[1] On appeal, the defendant also claimed that the trial court had improperly: (1) failed to give a curative instruction concerning the juror misconduct; (2) denied the defendant's motion for a mistrial when the jury indicated that it was deadlocked; and (3) instructed the jury concerning proof beyond a reasonable doubt. Because the Appellate Court concluded that the defendant's motion for a mistrial due to juror misconduct should have been granted, it did not reach the other issues. Therefore, on our remand, the Appellate Court will be required to consider these claims.

[2] We granted the state's petition for certification to appeal, limited to the following issues: "Did the Appellate Court properly conclude that the juror misconduct involved in this case (1) required it to exercise its supervisory authority so as to order a new trial, and (2) was a structural defect that required a new trial without an inquiry into its harmlessness?" *State* v. *Anderson*, 251 Conn. 926, 742 A.2d 363 (1999).

Enforcement Administration in Los Angeles, California, that a black woman in white clothing named Brenda McCoy, suspected of carrying narcotics, would be arriving at Bradley International Airport on TWA flight 290 at 8:30 p.m. that evening. Officers detained a woman at the airport fitting this description after a narcotics-detecting canine indicated that her suitcases contained narcotics. Her identification revealed that she was Brenda McCoy, and upon searching her suitcases, the officers found inside each a large bundle wrapped in cellophane and sheets covered with a blanket. The bundles weighed a total of 18.48 kilograms or 40.75 pounds and tested positive for marijuana. The officers placed McCoy under arrest.

"McCoy told the police that she was instructed to call a beeper number when she had the suitcases, and that a person would pick up the suitcases and give [to] her $1500. McCoy called the beeper number and arranged the pickup. The police in unmarked cars watched while a Pontiac Grand Am with a woman in the driver's seat and a male, later identified as the defendant, seated next to her, parked in front of McCoy's apartment building. The defendant exited the vehicle and, after meeting McCoy at the front entrance, followed her to her apartment. As the defendant exited the building with the suitcases, the police ordered him to stop. The defendant, instead, dropped the suitcases and ran out of the building. While outside, he shouted to the woman in the car that they had been set up by the police. The defendant and the woman were apprehended and placed under arrest." Id., 62–63.

The following additional facts, as set forth by the Appellate Court, are relevant to the defendant's claim on appeal that he was denied a fair trial by an impartial jury because the trial court improperly had denied his motion for a mistrial due to juror misconduct. "The trial was conducted in front of six jurors and three

alternate jurors. After the conclusion of the third day of trial, the trial judge was approached by an alternate juror, M, who indicated that she wanted to speak to the judge. The trial judge instructed the courtroom clerk to speak with the juror. M told the clerk that one of the jurors, L, had stated to the other jurors that he knew the defendant or had seen him 'on the street,' that the defendant was not a nice person and that 'they're going to get this guy for something.' The clerk informed the trial judge of M's statements, and the trial judge called counsel into court and had the clerk disclose M's statements to them. The next day when court reconvened, the trial judge instructed the clerk to state for the record the statements M made to him. The trial judge decided that it would be necessary to call M into open court to ascertain exactly what she overheard or what had been said to her. Counsel would be given the opportunity to submit questions to the court for the court to ask the juror.

"M testified that L stated to the other jurors that he knew the defendant and had seen him 'on the street,' that the defendant was 'not a very nice person' and that 'they're going to get this guy for something.' She testified that when she heard the statements, she thought that it did not seem right to her and that she should bring this matter to the court's attention. She said that she realized that L did not know the defendant personally. M also said that at a subsequent break in the jury deliberating room, another juror asked her what she thought about what L had said and then commented that 'it didn't seem right.' When M was asked by the trial judge if she could sit fairly and impartially and decide the case solely on the basis of the evidence presented, M answered, 'Yes.'

"The court then examined L. L stated that he had realized after the trial began that he recognized the defendant as a man he had seen once before when L

worked as an automobile mechanic, towing vehicles. L stated that he told the other jurors in the jury room that he knew the defendant. L also stated that he had no idea if the defendant was a nice person because he had never spoken with him and saw him only on that one occasion for a short period of time. L twice denied telling the other jurors that the defendant was not a very nice person and that 'they' would get him for something.

"On the basis of the testimony of M and L, the trial judge determined that a separate inquiry of the remaining five jurors and two alternates would be necessary. Juror W testified that another juror, while in the jury room, said that he knew the defendant on the street in the past. She stated that she could keep an open mind and decide the case on the basis of the evidence. Juror T testified that in the jury room with all the jurors present, another juror said that he thought he saw the defendant once and that the defendant was 'a pretty tough fellow.' T said that he 'tightened up a little bit' when he heard the statements. When asked if he could decide the case fairly, T replied, 'Absolutely yes.' He also stated that he could put aside what he had heard and decide the case on the basis of the evidence.

"Jurors P and R testified that they did not hear any statements concerning the defendant. Juror K testified that she heard a juror mention that he passed the defendant on the street once and that she heard the juror say something to the effect that the defendant 'did bad' and 'he knows he is in trouble.' When asked if she could be fair and impartial, K responded, 'Oh, sure. It hasn't changed anything.' She stated that she could put the statements aside and decide the case on the basis of the evidence. Juror A, an alternate, testified that he heard one juror state that he had seen the defendant on the street, but that no statements were made concerning what kind of person the defendant was or what should happen to the defendant, and that what he heard would

in no way affect his decision. Juror C, another alternate, testified that one juror stated that he knew the defendant, not personally, but that he had seen the defendant 'on the street.' C also testified that nothing was said as to whether the defendant was a bad person or concerning what should happen to him.

"Thus, three of the jurors testified to hearing [some or all of] L's statements regarding the defendant, namely, that the defendant was 'not a very nice person,' that the defendant is 'a pretty tough fellow,' that 'he did bad' and 'he knows he is in trouble,' and that 'they're going to get this guy for something.' Two jurors had no recollection whatsoever; the rest of the jurors and alternate jurors who heard something heard statements to the effect that L either knew the defendant or had seen him 'on the street.' The trial judge instructed all of the jurors and the alternate jurors that they must decide the case solely on the basis of the evidence, and all of them testified that they could decide the case fairly and impartially.

"Subsequent to the court's questioning of the jurors, the defendant requested that L be removed from the jury panel. The state did not object and agreed that L should be discharged and replaced with one of the alternates. Before ruling, the trial court recessed so that defense counsel could confer with the defendant. After the recess, the defendant moved for a mistrial. The defendant acknowledged that the trial court had fully complied with the mandates of *State* v. *Brown*, 235 Conn. 502, 668 A.2d 1288 (1995), and had made an adequate inquiry into the alleged juror misconduct. The defendant also admitted that L's statement that he knew the defendant from the street, if considered alone, was not prejudicial to the defendant. He claimed, however, that when combined with the other comments, the statements compromised the defendant's right to a fair and impartial jury, and that no action short of a mistrial

would be sufficiently curative. The state agreed that L should be removed, but argued that the trial should proceed with the remaining jurors and alternate jurors. Thereafter, the trial court discharged L from the juror panel and reserved decision on the motion until the following day.

"The next day, the trial court denied the defendant's motion because it concluded that the grounds for a mistrial did not exist. The trial court explained that it did not take extensive notes when the jurors were testifying because the court 'wanted to look right at the jurors, observe them as they were talking, observe their reactions and form [its] opinion . . . .' The court stated that case law mandates that consideration of extrinsic evidence by a juror is presumptively prejudicial to a defendant because it implicates a defendant's constitutional right to a fair trial by an impartial jury. The court noted, however, the distinction in the law between the mere expression of opinion as opposed to a positive expression of fact, and that in the former instance a mistrial is not warranted. The court stated that in the present case the kind of statements made were not of particular facts but rather statements of an opinion type.

"The court also stated: 'I did observe all of these jurors very closely and I thought all of them were being very honest and very candid and very genuine and sincere in their statement to the court . . . . [T]his would not in any way affect their judgment in the case . . . .' The court found the jurors' statements to be 'very credible.' The court stated that 'based on my assessment of the jurors that came in to take the stand and aware of the jurors' oath . . . we do not have a situation where they have formed an opinion of the accused . . . that is going to affect the way they view the accused or impact on their ability to be objective and impartial.'

"The alternate juror who had called the court's attention to the improper remarks, M, was not selected as a juror to replace L. Alternate juror C became a regular member of the jury. The final deliberating body consisted of four jurors who had heard some of the remarks of L about the defendant and two jurors who had not heard anything said by L. . . .

"The defendant claims that the statements made were so prejudicial to him that he was denied his constitutional right to a fair trial. The defendant claims that L expressed 'specific personal knowledge that the defendant was not a nice person and that the jury will get the defendant on something,' and that those statements were tantamount to the juror's becoming a witness and prosecutor against the defendant. The defendant, who is black, also claims that the fact that the juror who made the statements was the only black juror gave credibility to the statements and 'would likely influence the remaining jurors to convict a black defendant.' The defendant argues that the trial court abused its discretion in denying his motion for a mistrial, necessitating a new trial. The defendant urges, in the alternative, that, if no abuse of discretion is involved, this court exercise its supervisory authority over the administration of justice and grant him a new trial." *State* v. *Anderson*, supra, 55 Conn. App. 63–69.

The Appellate Court specifically concluded that there had been no abuse of discretion by the trial court. "[W]e want to emphasize that the trial court conducted an exemplary examination of the jurors and alternates to determine the scope of the juror misconduct." Id., 68. The Appellate Court determined, however, that the facts of this case required that it "exercise [its] supervisory authority over the administration of justice and order a new trial because we view the juror misconduct here as a contaminant affecting the structural integrity of the defendant's trial." Id., 69.

I

The state first claims that the Appellate Court improperly invoked its supervisory authority in reversing the judgment of the trial court and ordering a new trial. We agree.

We begin with the standard of review that governs this case. "In our review of the denial of a motion for mistrial, we have recognized the broad discretion that is vested in the trial court to decide whether an occurrence at trial has so prejudiced a party that he or she can no longer receive a fair trial. The decision of the trial court is therefore reversible on appeal only if there has been an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Newsome*, 238 Conn. 588, 628–29, 682 A.2d 972 (1996).

"Jury impartiality is a core requirement of the right to trial by jury guaranteed by the constitution of Connecticut, article first, § 8, and by the sixth amendment to the United States constitution. . . . [T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. . . . The modern jury is regarded as an institution in our justice system that determines the case solely on the basis of the evidence and arguments given [it] in the adversary arena after proper instructions on the law by the court. . . . Consideration [by the jury] of extrinsic evidence is presumptively prejudicial because it implicates the defendant's constitutional right to a fair trial before an impartial jury." (Internal quotation marks omitted.) *State* v. *Santiago*, 245 Conn. 301, 330, 715 A.2d 1 (1998).

"It is well established, however, that not every incident of juror misconduct requires a new trial. *State* v. *Newsome*, [supra, 238 Conn. 627]. [D]ue process seeks to assure a defendant a fair trial, not a perfect one. . . . [T]he constitution does not require a new trial every time a juror has been placed in a potentially

compromising situation . . . [because] it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. . . . *State* v. *Tomasko*, 242 Conn. 505, 513, 700 A.2d 28 (1997). The question is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial. . . . The defendant has been prejudiced if the misbehavior is such to make it probable that the juror's mind was influenced by it so as to render him or her an unfair and prejudicial juror." (Internal quotation marks omitted.) *State* v. *Rhodes*, 248 Conn. 39, 47, 726 A.2d 513 (1999). "Ultimately, however, [t]o succeed on a claim of [juror] bias the defendant must raise his contention of bias from the realm of speculation to the realm of fact. . . . *State* v. *Myers*, 242 Conn. 125, 141, 698 A.2d 823 (1997)." (Internal quotation marks omitted.) *State* v. *Mukhtaar*, 253 Conn. 280, 297, 750 A.2d 1059 (2000); see also *State* v. *Cubano*, 203 Conn. 81, 89, 523 A.2d 495 (1987).

"Our review of the scope of the trial court's preliminary inquiry into allegations of jury misconduct is governed by *State* v. *Brown*, supra, 235 Conn. 502. In *Brown*, we exercised our supervisory authority over the administration of justice to hold that . . . a trial court must conduct a preliminary inquiry, on the record, whenever it is presented with any allegations of jury misconduct in a criminal case, regardless of whether an inquiry is requested by counsel. Id., 526. We reiterated that the trial court has broad discretion to determine the form and scope of the proper response to allegations of jury misconduct; id., 523–24; and instructed that [i]n exercising that discretion, the trial court must zealously protect the rights of the accused. Id., 524. Our role as an appellate court is limited . . . to a consideration of whether the trial court's review of alleged jury misconduct can fairly be characterized as an abuse of its discretion. Id.

"We instructed that the trial court should consider the following factors in exercising its discretion as to the form and scope of a preliminary inquiry into allegations of jury misconduct: (1) the criminal defendant's substantial interest in his constitutional right to a trial before an impartial jury; (2) the risk of deprivation of the defendant's constitutional right to a trial before an impartial jury, which will vary with the seriousness and the credibility of the allegations of jury misconduct; and (3) the state's interests of, inter alia, jury impartiality, protecting jurors' privacy and maintaining public confidence in the jury system. Id., 530–31." (Internal quotation marks omitted.) *State* v. *Santiago*, supra, 245 Conn. 331.

We conclude that the inquiry conducted by the trial court in the present case was adequate to safeguard the defendant's right to a fair trial before an impartial jury. The court's inquiry consisted of interviews with each of the jurors and alternate jurors, in which it assessed their state of mind and determined whether they could be fair and impartial. The court determined that the jurors were credible in their assertions that they could be impartial and could base their decisions only on the evidence presented. See *State* v. *Newsome*, supra, 238 Conn. 631 ("[w]e are not inclined to disregard the statements of those jurors interviewed as inevitably suspect" [internal quotation marks omitted]). The trial court, moreover, was in the best position to assess the credibility of the jurors; id. ("the trial court that conducts [an inquiry] is in the best position to assess the testimony of those on the jury panel"); *State* v. *Cubano*, supra, 203 Conn. 92 ("we are aware of the broad discretion of a trial judge which includes his determination of the credibility to be given a juror's statement"); and acted within its discretion when it decided that the jurors could be impartial.

The trial court also determined that juror L's statements that "he knew the defendant from the street," that "he was not a nice guy," that "he is a tough fellow," that "he did bad" and that "they're going to get him for something," were expressions of opinion, and not statements of fact. The jurors who heard the comments, and juror L himself, acknowledged that he did not personally know the defendant. "In *State* v. *McCall*, [187 Conn. 73, 81, 444 A.2d 896 (1982)], we said: Mere expression of opinion, as opposed to positive expression of facts, does not warrant a mistrial. Even where a juror has formed some preconceived opinion as to the guilt of an accused, a juror is sufficiently impartial if he or she can set aside that opinion and render a verdict based on evidence in the case." (Internal quotation marks omitted.) *State* v. *Cubano*, supra, 203 Conn. 91. "It is enough if a juror is able to . . . decide the case on the evidence presented and the instructions given by the court." Id., 92.

It is undisputed, moreover, that the trial court conducted a proper *Brown* inquiry into the allegations of juror misconduct. See *State* v. *Anderson*, supra, 55 Conn. App. 68. On the basis of this inquiry, the trial court reasonably concluded that juror L's statements regarding the defendant did not prejudice the defendant, and reasonably determined that a mistrial was not warranted.

We disagree with the defendant's contention that the Appellate Court properly reversed the trial court's judgment and ordered a new trial based on its supervisory authority. "Appellate courts possess an inherent supervisory authority over the administration of justice. . . . The standards that [are] set under this supervisory authority are not satisfied by observance of those minimal historic safeguards for securing trial by reason which are summarized as due process of law . . . . Rather, the standards are flexible and are to be deter-

mined in the interests of justice. . . . [O]ur supervisory authority is not a form of free-floating justice, untethered to legal principle. . . . *State* v. *Pouncey,* 241 Conn. 802, 812–13, 699 A.2d 901 (1997). Rather, the integrity of the judicial system serves as a unifying principle behind the seemingly disparate use of our supervisory powers. See *State* v. *Hines,* 243 Conn. 796, 815, 709 A.2d 522 (1998) ([o]ur supervisory powers are invoked only in the rare circumstance where [the] traditional protections are inadequate to ensure the fair and just administration of the courts); *State* v. *Coleman,* 242 Conn. 523, 540, 700 A.2d 14 (1997) ([w]e previously have exercised our supervisory powers to direct trial courts to adopt judicial procedures that will address matters that are of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole)." (Internal quotation marks omitted.) *State* v. *Santiago,* supra, 245 Conn. 332–33.

"Although [w]e previously have exercised our supervisory powers to direct trial courts to adopt judicial procedures; *State* v. *Coleman,* supra, 242 Conn. 540; we also have exercised our authority to address the result in individual cases, notably those involving instances of prosecutorial misconduct because we recognize that such conduct, although not rising to the level of constitutional magnitude, is unduly offensive to the maintenance of a sound judicial process." (Internal quotation marks omitted.) *State* v. *Santiago,* supra, 245 Conn. 334.

This case does not present an appropriate situation in which to exercise our supervisory authority. The procedure set forth in *Brown,* namely, that "a trial court must conduct a preliminary inquiry, on the record, whenever it is presented with any allegations of jury misconduct in a criminal case"; *State* v. *Brown,* supra, 235 Conn. 526; adequately addressed this situation. The trial court conducted a proper *Brown* inquiry, made

credibility determinations, and denied the defendant's motion for a mistrial. "We recognize that the trial judge has a superior opportunity to assess the proceedings over which he or she personally has presided; *State* v. *Ross*, [230 Conn. 183, 227, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995)]; *State* v. *Rodriguez*, [210 Conn. 315, 326, 554 A.2d 1080 (1989)]; and thus is in a superior position to evaluate the credibility of allegations of jury misconduct, whatever their source." *State* v. *Brown*, supra, 527–28.

We also have exercised our supervisory authority to adopt "rules intended to guide the lower courts in the administration of justice in all aspects of the criminal process. See, e.g., *State* v. *Coleman*, [supra, 242 Conn.] 542 (judicial explanation required for imposition of greater sentence after trial than after plea); *State* v. *Gould*, 241 Conn. 1, 15, 695 A.2d 1022 (1997) (videotaped deposition must be played in open court, not in jury room); *State* v. *Brown*, supra, 235 Conn. 528 (judicial inquiry on the record into allegations of juror misconduct); *State* v. *Breton*, 235 Conn. 206, 250, 663 A.2d 1026 (1995) (special verdict form submitted to jury in capital sentencing case must include brief statement of jury's responsibility for determining whether defendant is sentenced to death); *State* v. *Jones*, 234 Conn. 324, 346–47, 662 A.2d 1199 (1995) (bifurcation of jury proceedings in certain death penalty cases); *State* v. *Patterson*, 230 Conn. 385, 397–400, 645 A.2d 535 (1994), on appeal after remand, 236 Conn. 561, 674 A.2d 416 (1996) (trial judge must continuously be present to oversee voir dire); *State* v. *Holloway*, 209 Conn. 636, 645–46, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989) (where defendant asserts claim under *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 [1986], state must make prima facie showing

of neutral jury selection method)." *State* v. *Santiago*, supra, 245 Conn. 333–34.

This aspect of the use of our supervisory authority would be inappropriate in the present case because it would not have sufficient boundaries to guide future trial courts. Rather, it would more likely create confusion as to the proper procedures to follow in jury misconduct cases.

There is nothing in the record, moreover, that supports the contention that this is an extraordinary case requiring this court to invoke its supervisory authority. The defendant argues that this is the type of misconduct that cannot be cured because it goes to the core of a criminal defendant's right to a trial by an impartial jury. We are unpersuaded. It is true that the jurors were exposed to extrinsic evidence, namely, juror L's opinions regarding the defendant's character. Extrinsic evidence, however, is only presumptively prejudicial; *State* v. *Asherman*, 193 Conn. 695, 736, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985); and the trial court, by conducting an exemplary *Brown* inquiry, determined that the defendant had suffered no actual prejudice. See *State* v. *Cubano*, supra, 203 Conn. 90 ("defendant's burden to prove actual bias on behalf of the juror"). Indeed, this case presents precisely one of the prototypes of juror misconduct that *Brown* and its progeny are designed to address.

The defendant also contends that, because both juror L and the defendant were black, and because juror L was the only black juror, the juror's comments must be deemed to be prejudicial. The defendant contends that this racial identity between juror L and the defendant requires the conclusion that the other jurors, despite their disclaimers, must have credited juror L's remarks. We reject this contention. First, the defendant

did not make this contention when the trial court conducted its *Brown* inquiry. If that were truly such a powerful contention that it required the trial court's exercise of discretion to declare a mistrial despite crediting the jurors' testimony to the contrary, we would expect the defendant to have brought this argument to the trial court's attention. Second, there is nothing in the record to suggest that race played any part in either the jurors' deliberations or in the defendant's conviction.

We are, nevertheless, mindful of racial discrimination, and take every precaution to guard against racism in our courtrooms. "We previously have exercised our inherent supervisory authority to safeguard against the improper consideration of race in criminal trials; see *State* v. *Holloway*, supra, 209 Conn. 645–46; and we will not hesitate to do so again if necessary." *State* v. *Pouncey*, supra, 241 Conn. 816–17.

In *Pouncey*, four women were attacked by the defendant after exiting a restaurant. Id., 805. In her closing statement, the assistant state's attorney stated: "[The victims were] minding their own business when they were confronted with what suburbanites would call the ultimate urban nightmare." Id., 806. On the basis of these and other remarks, the defendant moved for a mistrial, which the trial court denied. Id. This court affirmed the Appellate Court's decision not to invoke its supervisory authority because we found that the defendant had not shown a "pattern or practice of misconduct . . . among the state prosecutors" warranting reversal of his conviction so as to "serve the important purpose of demonstrating that such conduct cannot, and will not, be tolerated." Id., 815–16. Similarly, we have not been presented with a pattern or practice of misconduct, or any improper racial implications, by any party, that would be deterred in future cases by invoking our supervisory authority in the present case.

Furthermore, we already have created a procedure for dealing with allegations of racial bias, based specifically on *Brown*. See *State* v. *Santiago*, supra, 245 Conn. 301. In *Santiago*, a juror allegedly referred to the defendant as a "spic." Id., 324. The trial court conducted a *Brown* inquiry and found that the allegations were not credible. Id., 332. The defendant argued that the trial court abused its discretion in not conducting a more thorough inquiry. Id., 324. This court determined that the trial court had not abused its discretion in conducting its preliminary inquiry, but given the importance of the issue, exercised its supervisory authority to expand the scope of the preliminary inquiry. Id., 336. This court held that in future cases involving allegations of racial bias, a more extensive inquiry than that prescribed in *Brown* is required: "Such inquiry should include, at a minimum, an extensive inquiry of the person reporting the conduct, to include the context of the remarks, an interview with any persons likely to have been a witness to the alleged conduct, and the juror alleged to have made the remarks." Id., 340. We did not, however, create a per se rule of reversal for allegations of racial bias.

In the present case, even though none of the parties treated the misconduct in question as involving allegations of racial bias, the trial court conducted, in essence, a *Santiago* inquiry. The trial court not only interviewed the juror who reported the remarks, but also the juror who allegedly had made the remarks. The trial court also interviewed all of the persons who might have overheard juror L's allegations, namely, each of the other jurors and the alternate jurors. The court questioned each juror regarding the context of the remarks, while being careful not to influence any juror's answers. Both the state and defendant, as well as the Appellate Court, believed that the trial court conducted a thorough inquiry into the allegations. Moreover, it could not have escaped the trial court's attention that juror

L was the only juror who was black, and that the defendant was black. Thus, the trial court complied with the procedures created in *Santiago,* and did not abuse its discretion under that standard.

## II

The state next claims that the Appellate Court improperly determined that the jury misconduct in this case created a structural defect in the trial, necessitating a new trial regardless of the harmlessness of the misconduct. The defendant argues, to the contrary, that the Appellate Court was correct in its assessment that extrinsic evidence of the defendant's character is a defect in the trial mechanism itself that requires automatic reversal. We agree with the state.

The United States Supreme Court has recognized that "most constitutional errors can be harmless." (Internal quotation marks omitted.) *Neder* v. *United States,* 527 U.S. 1, 8, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999); see also *Arizona* v. *Fulminante,* 499 U.S. 279, 306, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991). "The harmless error doctrine is essential to preserve the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial." *Arizona* v. *Fulminante,* supra, 308; see also *Rose* v. *Clark,* 478 U.S. 570, 577, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986). In contrast, the Supreme Court has found structural errors in only a "very limited class of cases. *Johnson* v. *United States,* 520 U.S. 461, 468 [117 S. Ct. 1544, 137 L. Ed. 2d 718] (1997) (citing *Gideon* v. *Wainwright,* 372 U.S. 335 [83 S. Ct. 792, 9 L. Ed. 2d 799] (1963) (complete denial of counsel); *Tumey* v. *Ohio,* 273 U.S. 510 [47 S. Ct. 437, 71 L. Ed. 749] (1927) (biased trial judge); *Vasquez* v. *Hillery,* 474 U.S. 254 [106 S. Ct. 617, 88 L. Ed. 2d 598] (1986) (racial discrimination in selection of grand jury);

*McKaskle* v. *Wiggins*, 465 U.S. 168 [104 S. Ct. 944, 79 L. Ed. 2d 122] (1984) (denial of self-representation at trial); *Waller* v. *Georgia*, 467 U.S. 39 [104 S. Ct. 2210, 81 L. Ed. 2d 31] (1984) (denial of public trial); *Sullivan* v. *Louisiana*, 508 U.S. 275 [113 S. Ct. 2078, 124 L. Ed. 2d 182] (1993) (defective reasonable-doubt instruction))." (Internal quotation marks omitted.) *Neder* v. *United States*, supra, 8.

Structural defect cases defy analysis by harmless error standards because the "entire conduct of the trial, from beginning to end, is obviously affected . . . ." *Arizona* v. *Fulminante*, supra, 499 U.S. 309–10. These cases "contain a defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself. [Id.] 310. Such errors infect the entire trial process, *Brecht* v. *Abrahamson*, 507 U.S. 619, 630 [113 S. Ct. 1710, 123 L. Ed. 2d 353] (1993), and necessarily render a trial fundamentally unfair, *Rose* [v. *Clark*, supra, 478 U.S. 577]. Put another way, these errors deprive defendants of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair." (Internal quotation marks omitted.) *Neder* v. *United States*, supra, 527 U.S. 8–9.

This court, as well as the United States Supreme Court, has expressly held that the procedure to be followed for resolving claims of jury bias is an inquiry into the allegations and a determination of whether there was actual prejudice to the defendant. See *State* v. *Booth*, 250 Conn. 611, 649, 737 A.2d 404 (1999), cert. denied sub nom. *Brown* v. *Connecticut*, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000) ("[t]he question is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial" [internal quotation marks omitted]); *State* v. *Newsome*, supra, 238 Conn. 628 (same); see also *Smith* v. *Phillips*, 455 U.S.

209, 215, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982) ("[t]his Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias").

Under the standards set by this court and the United States Supreme Court, this case does not present a structural defect. Juror L's statements did not present a defect that affected the framework within which the trial proceeded, but rather, affected the trial process. The defendant's trial was not fundamentally unfair from start to finish, such as when members of the defendant's race are unlawfully excluded from grand jury selection; *Vasquez* v. *Hillery*, supra, 474 U.S. 254; where a defendant is denied the right to counsel at trial; *Gideon* v. *Wainwright*, supra, 372 U.S. 335; or where the judge receives compensation for convictions; *Tumey* v. *Ohio*, supra, 273 U.S. 510. Rather, the misconduct in this case was the introduction of extrinsic evidence several days into the trial. Although extrinsic evidence is presumptively prejudicial; *State* v. *Santiago*, supra, 245 Conn. 330; it is the defendant's burden to prove actual bias. *State* v. *Newsome*, supra, 238 Conn. 628 ("[w]here, however, the trial court was in no way responsible for the juror misconduct . . . we have repeatedly held that a defendant who offers proof of juror misconduct bears the burden of proving that actual prejudice resulted from that misconduct" [internal quotation marks omitted]).

The trial court conducted an exemplary inquiry into the allegations of jury misconduct and determined that the jury could be impartial, based on its own observations and the statements of the jurors. We previously have determined that jurors' own statements that they can remain impartial even after being introduced to extrinsic evidence are to be given some weight. Id., 631 ("[w]e are not inclined to disregard the statements of those jurors interviewed as inevitably suspect" [internal

quotation marks omitted]); *State* v. *Cubano*, supra, 203 Conn. 92 ("[w]hile we recognize that a juror's assurances that he or she is equal to the task are not dispositive of the rights of an accused . . . we are aware of the broad discretion of a trial judge which includes his determination of the credibility to be given a juror's statement in this context" [citation omitted]); see also *Smith* v. *Phillips*, supra, 455 U.S. 217 n.7 ("surely one who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain matter" [internal quotation marks omitted]).

We disagree with the defendant and the Appellate Court that "[t]his case involves a systemic flaw the nature of which makes it difficult to assess its effects on the defendant." *State* v. *Anderson*, supra, 55 Conn. App. 75. The development of our case law in this area provides for just this sort of assessment. Well before we exercised our supervisory authority in *State* v. *Brown*, supra, 235 Conn. 502, trial courts were called upon to use their discretion to protect criminal defendants' rights to a fair trial when there were allegations of jury misconduct. See, e.g., *State* v. *Cubano*, supra, 203 Conn. 81 (juror shocked that personal friend would associate with defendant); *State* v. *Asherman*, supra, 193 Conn. 695 (juror copied definition from dictionary; jurors conducted experiment during deliberations with articles brought from home); *State* v. *McCall*, supra, 187 Conn. 73 (juror's son had psychiatric symptoms similar to defendant's).

We have determined that the introduction of extrinsic evidence does not automatically necessitate a new trial, and we are not persuaded that the particular facts of the present case are so extraordinary as to require special consideration. "[T]he Constitution entitles a criminal defendant to a fair trial, not a perfect one." (Internal quotation marks omitted.) *Rose* v. *Clark*, supra, 478 U.S.

579. The trial court conducted the proper inquiry, made a reasonable determination based on its inquiry, and the defendant received a fair trial. There is simply no basis to cast this case in the mold of a structural defect.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to consider the defendant's remaining claims.

In this opinion the other justices concurred.